**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
**Counsel for Plaintiffs**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL RODRIGUEZ, NEGEEN MIRREGHABIE, and CHRISTOPHER JENNEN, on behalf of themselves, all others similarly situated, and the general public,<br><br>    Plaintiffs,<br><br>        v.<br><br>MONDELĒZ GLOBAL LLC,<br><br>        Defendant. | Case No: 23-cv-57-DMS-AHG<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>Judge: Hon. Dana M. Sabraw |

Plaintiffs Crystal Rodriguez, Negeen Mirreghabie, and Christopher Jennen, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Mondelēz Global LLC ("Mondelēz"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## **INTRODUCTION**

1.     Defendant Mondelēz is a subsidiary of Mondelez International, Inc., a multinational confectionery, food, holding and beverage and snack food company based in Chicago with revenues of nearly $30 billion in 2021. Mondelēz markets and sells a variety of dark chocolate products, under different brand names. These include at least Hu Organic Simple Dark Chocolate 70% Cacao, Green & Black's Organic Dark Chocolate 70% Cacao, and Green & Black's Organic Dark 85% Cacao [hereafter the "Products"]. Mondelēz sells the Products throughout the United States, including in California.

2.     A December 2022 report by Consumer Reports states that "[r]esearch has found that some dark chocolate bars contain cadmium and lead—two heavy metals linked to a host of health problems in children and adults," in amounts such that "eating just an ounce a day would put an adult over a level that public health authorities and [Consumer Report's] experts say may be harmful for at least one of those heavy metals." Among those containing substantial levels of lead and cadmium are the Products, as pictured below.




3.      As shown above, the Hu 70% Cacao bar had lead content that was more than 200% of "California's maximum allowable dose level (MADL)" and the Green & Black's 70% Cacao bar had 143% of the MADL for lead, and 181% for cadmium.

4.      The Green & Black's Organic Dark 85% Cacao was tested by other independent experts in October 2014, and March 2016, and each time was found to contain amounts of cadmium between 13.6 and 14.4μg, almost 3 times in excess of the 4.1μg MADL. It also contained lead as high as 0.8μg, which is 1.6 times the 0.5μg MADL for lead.[1]



| Test Date | Lead (μg/serving) | Cadmium (μg/serving) |
|---|---|---|
| 02/2016 | 0.8 | 13.6 |
| 10/2014 | 0.6 | 14.4 |
| 10/2014 | 0.8 | 14.0 |

5.      Lead and cadmium are heavy metals and their presence in food, alone or combined, poses a serious safety risk to consumers because they can cause cancer, often irreversible damage to brain development, liver, kidneys, and bones, and other health problems. As Consumer Reports noted, "both cadmium and lead pose serious health risks" and, with respect to lead specifically, "no amount of it is considered safe."

---

[1] https://www.asyousow.org/environmental-health/toxic-enforcement/toxic-chocolate

6.     Mondelēz markets the Products with labeling representations that convey to reasonable consumers that the Products do not contain unsafe levels of toxic heavy metals, including lead and cadmium. The Products' labels are designed and intended to, and in fact did, convince reasonable consumers, including Plaintiffs, that the Products do not contain unsafe levels of toxic heavy metals, including lead or cadmium. These reasonable beliefs were reinforced by statements in other media, including on defendant's websites.

7.     As described more fully below, consumers who purchased the Products were injured by Mondelēz's acts and omissions concerning the presence of lead and cadmium. No reasonable consumer would know, or have reason to know, that the Products contained heavy metals, including lead and cadmium. Independent experts have identified the business practices of dark chocolate sellers, like Mondelēz, as at least one of the primary reasons for the dangerous levels of heavy metals found in dark chocolate products purchased and consumed by the public. Worse, as companies across the industry have made changes to business practices and adopted methods to limit heavy metals in their dark chocolate products, Mondelēz has stood idly by with a reckless disregard for its consumers' health and well-being.

8.     Plaintiffs bring this action against Mondelēz on behalf of themselves, similarly-situated Class Members, and the general public to enjoin Mondelēz from deceptively marketing the Products, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

9.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Mondelēz. In addition, more than two-thirds of the members of the class reside in states other than the state in which Mondelēz is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

10.     The Court has personal jurisdiction over Mondelēz because of Mondelēz's substantial, continuous and systematic contacts with the State of California, and because Mondelēz has purposely availed itself of the benefits and privileges of conducting business activities within the State of California, including by marketing, distributing, and selling the Products in California.

11.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Mondelēz resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

12.     Plaintiff Crystal Rodriguez is a citizen of California and is domiciled in, and is a resident of, San Diego County, California.

13.     Plaintiff Negeen Mirreghabie is a citizen of California and is domiciled in, and is a resident of, San Diego County, California.

14.     Plaintiff Christopher Jennen is a citizen of California and is domiciled in, and a resident of, Riverside County, California.

15.     Defendant Mondelēz Global LLC is a Delaware corporation with its principal place of business in Chicago, Illinois.

## FACTS

I.    **Lead and Cadmium are Toxic and are Present in the Mondelēz Products at Unsafe Levels**

16.     "No amount of lead is known to be safe"[2] because "there is no known safe blood lead concentration."[3] This is especially true because lead accumulates in the body with

---

[2] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR The Two-Way (Aug. 13, 2016). Available online at https://tinyurl.com/4vt7zvr2.

[3] World Health Organization Fact Steet, Lead poisoning. Available online at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

repeated exposure. Even "extremely low" levels of lead exposure were "found to reduce the cognitive capacity of children"[4] when the exposure is consistent and "prolonged intake of even [] low level[s] of lead is hazardous to human beings."[5] "Once in the bloodstream, lead is primarily distributed among three compartments – blood, mineralizing tissue, and soft tissues. The bones and teeth of adults contain more than 95% of total lead in the body."[6] However, in times of stress, "the body can mobilize lead stores, thereby increasing the level of lead in the blood," making repeated exposure, even at low levels, particularly sinister, since it is capable of lying in wait to be released into the blood at unexpected times.

17.    Along with bones, teeth and blood, many other tissues store lead in the body, including the brain, spleen, kidneys, liver, and lungs.[7] Lead has been conclusively found to have no positive physiological role in the body, "while its harmful effects are manifold."[8] The effects of lead have been well studied also at the cellular level and "heavy metals, including lead, create reactive radicals which damage cell structures, including DNA and cell membrane."[9]

18.    In particular, "young children and pregnant women especially should avoid exposure to lead."[10] Children are at particular risk when it comes to lead exposure because it can harm a child's brain development, resulting in learning and behavioral problems.[11]

[4] Needleman HL, *et al*. "The longterm effects of exposure to low doses of lead in childhood--An 11-year follow-up report." N Engl J Med. 1990;322:83–88.

[5] Wani AL, *et al*. "Lead toxicity: a review." Interdiscip Toxicol. 2015 Jun;8(2):55-64. doi: 10.1515/intox-2015-0009. PMID: 27486361; PMCID: PMC4961898.

[6] *Id*.

[7] Dart RC, et al. "Lead. In: Dart RC, editor." Medical Toxicology. 3rd ed. Lippincot Williams and Wilkins; 2004.

[8] *Id*.

[9] Kosnett MJ. Lead. In: Olson K.R, editor. Poisoning and Drug Overdose. 5th ed. McGraw Hill Professional; 2006

[10] https://www.asyousow.org/environmental-health/toxic-enforcement/toxic-chocolate

[11] https://www.centerforfoodsafety.org/

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

While the levels in any one food may be low, the cumulative effect of lead and other heavy metals in the diet can be significant. Additionally, an EPA analysis has found that, for more than 70% of children in the US, the dominant source of lead exposure is from food.[12]

19.     Exposure puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder (ADHD)), type 2 diabetes, and cancer, among other health issues. Heavy metals also pose risks to adults. Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.

20.     Additionally, even for adults, exposure to lead may cause anemia, weakness, and kidney and brain damage.[13] Lead affects almost every organ and system in the body and accumulates over time, leading to severe health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death.[14] Lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth.[15]

21.     Cadmium, another heavy metal, likewise poses a serious safety risk to consumers because it can cause cancer and is a known teratogen, an agent which causes malformation of an embryo. Exposure to cadmium can affect the kidneys, lungs, and bones.[16] There may be no safe level of exposure to a carcinogen, so all contact should be reduced to

---

[12] Center for Food Safety, FDA's Outdated Lead Standards Put the Public's Health at Risk (Dec. 9, 2020). Available online at https://tinyurl.com/5fcj8uuz

[13] https://www.cdc.gov/niosh/topics/lead/health.html

[14] *Id.*

[15] Centers for Disease Control and Prevention, Childhood Lead Poisoning Prevention. Available online at https://www.cdc.gov/nceh/lead/prevention/pregnant.htm.

[16] Better Health Channel, Environmental Health, Cadmium. Available online at https://tinyurl.com/4r8frd7z.

the lowest possible level.[17] Cadmium is considered a class 1 carcinogen by the World Health Organization.[18] Even at low exposure, cadmium can cause nausea, vomiting, diarrhea and abdominal pain. And, because cadmium builds up in the body, even at low dosage, repeated exposure can cause liver and kidney damage, anemia, and loss of smell. According to the Centers for Disease Control and Prevention, "exposure to low levels of cadmium in . . . food . . . over time may build up cadmium in the kidneys and cause kidney disease and fragile bones" and is indisputably "considered a cancer-causing agent."[19]

22.     Like with lead, "children are more susceptible than adults to exposure from low doses of cadmium over time."[20]

23.     The Products contain lead and cadmium, and Mondelēz has known as much for at least the last eight years. In 2014, Mondelēz was put on notice that at least some of its dark chocolate products, including the Green & Black's products at issue here, contained excessive cadmium and/or lead, or both, including by being provided with certificates of merit that independent experts confirmed the presence of heavy metals in the Mondelēz Products. Moreover, the Green & Black's 70% Cacao bar was tested as recently as March 2022 and was still above the California MADL for both lead and cadmium.[21] However, Mondelēz failed to warn consumers that consuming the Products exposes them to those chemicals.

---

[17] New Jersey Department of Health Fact Sheet. Available online at https://www.nj.gov/health/eoh/rtkweb/documents/fs/0305.pdf.

[18] United Nations Environment Porgramme, Lead and Cadmium. Available online at https://www.unep.org/explore-topics/chemicals-waste/what-we-do/emerging-issues/lead-and-cadmium.

[19] Centers for Disease Control and Prevention, National Biomonitoring Program, Cadmium Factsheet. Available online at https://tinyurl.com/y4f2kku7.

[20] As You Sow, Toxins in Chocolate. Available online at https://www.asyousow.org/environmental-health/toxic-enforcement/toxic-chocolate

[21] Id.

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
First Amended Class Action Complaint

24.     Moreover, in December 2022, Consumer Reports, a consumer protection and advocacy organization dedicated to independent product testing, consumer-oriented research, and investigative journalism, tested 28 different dark chocolate bars for lead and cadmium. The results showed that the Mondelēz Hu 70% Cacao dark chocolate bar had about 2.1 times the MADL for lead, and the Green & Black's 70% Cacao dark chocolate bar contained more than 1.4 times the MADL for lead and more than 1.8 times the MADL for cadmium. These MADL standards are set by the California Office of Environmental Health Hazard Assessment ["OEHHA"].

25.     Notably, the lead is getting into the Mondelēz Products *after* harvesting. As Consumer Reports notes, "lead seems to get into cacao after beans are harvested. The researchers found that the metal was typically on the outer shell of the cacao bean, not in the bean itself. Moreover, lead levels were low soon after beans were picked and removed from pods but increased as beans dried in the sun for days. During that time, lead-filled dust and dirt accumulated on the beans." A committee of experts formed to look at ways to reduce lead found in chocolate bars concluded, in part, that the lead "contamination in chocolate products [occurs] during ***post-harvest processing*** and not from the uptake of [lead] in the nib."[22] Those same experts recommend that reducing the lead in the products will come from changes to "agricultural, manufacturing, [and/or] business practices"[23] and, therefore, reducing (or perhaps even eliminating) toxic heavy metals in the Products is not unreasonable.

26.     A report from the *Seattle Times* further notes that "lead levels are influenced by where and how the cacao beans are handled by humans after harvest."[24]

---

[22] Expert Investigation Related to Cocoa and Chocolate Products, Final Report (Mar. 28, 2022). Available online at https://tinyurl.com/239zv83d.

[23] *Id*.

[24] Vonnai Phair, *How heavy metals get into dark chocolate bars*, Sea. Times (Feb. 10, 2023). Available online at https://tinyurl.com/mw58v97k.

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

27.     In short, Mondelēz could have implemented changes to harvest and manufacturing processes (or ensured it was doing business with farmers and manufacturers that implemented such measures) to eliminate, or at least significantly reduce, toxic heavy metal contamination in the Products it sold to Plaintiffs and the public, but chose not to. Thus, on information and belief, Mondelēz itself is responsible for lead being present in the Products, at least in the levels at which they are found in the Products.

## II.     Mondelēz Falsely Advertises the Products

28.     Despite knowing that its Products contain unsafe levels of toxic heavy metals, including lead and cadmium, Mondelēz intentionally marketed them so as to convey to reasonable consumers, including to Plaintiffs, that the Products did *not* contain such unsafe levels of toxic heavy metals.

29.     The Hu product makes prominent claims on the label of the Organic Simple Dark Chocolate 70% Cacao that convey to reasonable consumers that they do not contain unsafe levels of toxic heavy metals. These claims include, at least, that it contains only "SIMPLE" ingredients and that its consumption is "the way humans ate before industry ruined food." The Hu product reinforces this message by prominently displaying on the label to "Get Back to Human." Mondelēz also claims on the label that the Hu product is comprised of only "ultra simple ingredients." These and other claims, including the label as a whole, led reasonable consumers, including Plaintiffs, to conclude that the Hu product does not contain unsafe levels of toxic heavy metals, and that, even if toxins exist because, for some products, "industry ruin[s] food," no such toxins will be found in the Hu product.

30.     Further, on its website, Defendant proclaims that "we couldn't find a chocolate that met our standards. So we made our own." The website further tells consumers that the founder of Hu, relying on "extensive health and wellness readings," "hung up his corporate suit and immersed himself in all things nutrition and food." The website also tells consumers that the Hu product was developed after the founder investigated "the impact of certain foods and additives on our health, immunity, and performance" and that, as a result, the Hu product

"replac[ed] weird, industrial ingredients with simple, healthier ones," which "was the key to thriving, not just surviving." The website makes additional claims that convey to reasonable consumers that the Hu product does not contain any elements that are toxic to human health, including at least the following statements:

- "We obsessively vet every ingredient";
- "We help people get back to human"; and
- "No weird ingredients. Ever."

31.    On the labels of the Green & Black's product, Mondelez promises that it is made only with "the finest" cacao beans, conveying to reasonable consumers that the Green & Black product does not contain unsafe levels of toxic heavy metals. Alternatively, that it is made with only the "finest" cacao beans, conveys to reasonable consumers that, even if some other confectionary products contain unsafe, or toxic elements, the Green & Black's product does not, or at least does not contain unsafe levels of toxic heavy metals. This message is reinforced by the label as a whole, which conveys to reasonable consumers that it is a premium confectionary product, made from premium, fine ingredients, and no reasonable consumer would expect such premium food products to contain toxic elements, including lead or cadmium.

**III.    Reasonable Consumers Do Not Expect Heavy Metals in the Mondelēz Products; Mondelēz Nevertheless Failed to Disclose the Presence of Lead or Cadmium in the Products**

32.    The global dark chocolate market has witnessed significant growth in recent years and is expected to continue growing into 2023.[25]

33.    The growth of dark chocolate sales is premised, in part, on reasonable consumers' belief that dark chocolate is actually *healthier* than other food choices, and especially healthier than other confectionaries, specifically milk chocolates. Specifically, consumers understand that the higher cacao content in dark chocolate products results in

---

[25] https://www.persistencemarketresearch.com/market-research/dark-chocolate-market.asp

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

greater antioxidant benefits. "The pervasive health and wellness trend continues to influence dark chocolate market, with manufacturers incorporating organic ingredients and natural sweeteners. The preference for dark chocolate over milk chocolates on accounts its health benefits continues to remain intact," especially as demand for healthy products, generally, increases.[26] Thus, the safety and health effects of the Products are material facts to reasonable consumers.

34. Given the toxic effects of lead and cadmium, the presence of unsafe levels of toxic heavy metals in the Products is a material fact to reasonable consumers, including Plaintiffs and Class Members.

35. A global company as ubiquitous as Mondelēz has earned significant public trust that its foods are safe and fit for regular consumption. Reasonable consumers believe that Mondelēz would not sell products that are unsafe.

36. If the presence, or the risk of presence, of unsafe levels of toxic heavy metals in its Products were disclosed to Plaintiffs and the Class Members, they would be unwilling to purchase the Products or would pay less for them. Mondelēz knew this.

37. In light of Mondelēz's knowledge that Plaintiffs and the Class Members would be unwilling to purchase the Products or would pay less for the Products if they knew that the Products contained toxic heavy metals, Mondelēz intentionally and knowingly concealed this fact from Plaintiffs and the Class Members and did not disclose the presence of lead or cadmium on the label of the Products.

38. Mondelēz knew or should have known that Plaintiffs and the Class Members would rely upon the packaging of the Products, and intended for them to do so, but failed to disclose the presence of lead or cadmium.

39. Mondelēz knew or should have known that it owed consumers a duty of care to adequately test for lead, cadmium, and other heavy metals, particularly considering that it was provided notice of independent expert testing of the Products. Had Mondelēz done so,

---

[26] *Id.*

it would have known that its Products contained significant levels of lead or cadmium. Alternatively, Mondelēz *did* know that its Products contained significant levels of heavy metals and purposely hid that fact from consumers.

40.     Additionally, Mondelēz knew or should have been aware that a reasonable consumer would consume the Products regularly, and possibly multiple Products daily, leading to repeated exposure to both lead and cadmium, which each independently accumulate in the body and its systems over time.

41.     Mondelēz knew or should have known it could control the levels of lead and cadmium in the Products by properly monitoring for heavy metal presence, sourcing ingredients with less heavy metals, adjusting its formulation to reduce or eliminate heavy metals, or improving its manufacturing processes to eliminate introduction of lead caused by Mondelēz itself.

42.     Prior to purchasing the Products, Plaintiffs and the Class Members were exposed to, saw, read, and understood the labels of the Products, and relied upon the same in purchasing the Products, but Mondelēz failed to disclose the presence of heavy metals.

43.     As a result of Mondelēz's concealment of the fact that the Products contained toxic heavy metals, including lead and cadmium, Plaintiffs and the Class Members reasonably believed the Products were free from these substances that would negatively affect children's development as well as their own health.

44.     Plaintiffs and the Class Members purchased the Mondelēz Products in reliance upon Mondelēz labels that contained material omissions.

45.     Had Plaintiffs and the Class Members known that the Products contained toxic heavy metals, rendering them unsafe for consumption, they would not have been willing to purchase the Products or would have paid less for them.

46.     Therefore, as a direct and proximate result of Mondelēz's omissions concerning the Products, Plaintiffs and the Class Members purchased the Products and paid more than they were worth.

47.     Plaintiffs and the Class Members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth about the Products. Since the presence of toxic heavy metals, including lead and cadmium, in the Products renders them unsafe for human consumption, the Products that Plaintiffs and the Class Members purchased are worthless, or at a minimum are worth less than Plaintiffs and the Class paid for them.

**IV.    The Products' Labeling Violates California and Federal Food Labeling Law**

48.     The Products' labeling violates California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g*., *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

49.     First, the labeling and website claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Mondelēz accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

50.     Second, Mondelēz "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products given that they contain lead and cadmium, which are unsafe in any amount. In addition, such facts include the detrimental health consequences of consuming the Products, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death, which are all material to a consumer choosing a food product.

51.     Third, Mondelēz failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Mondelēz failed to disclose the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the dark chocolate Products in the customary and prescribed manners, including regular consumption of the standard serving size.

**V.     Plaintiffs' Purchase, Reliance, And Injury**

52.     Ms. Rodriguez regularly purchased the Hu Organic Simple 70% Cacao product during the Class Period, often making her purchases from Whole Foods and Sprouts in San Diego, including at least the Whole Foods at 8825 Villa La Jolla San Diego, California and Sprouts locations at 3015 Clairemont Dr. and 3358 Governor Dr., in San Diego, California.

53.     When purchasing the Products, Ms. Rodriguez was seeking chocolate bars she believed to be premium, or of a higher quality, than other confectionaries. Moreover, Ms. Rodriguez would have avoided any food she knew contained unsafe levels of toxic heavy metals like lead and cadmium. She would also have avoided purchasing any food she knew could increase her risk of inhibited neurological function, anemia, kidney damage, seizures, coma, or death.

54.     Ms. Mirreghabie occasionally purchased the Hu Organic Simply 70% product during the Class Period from Jimbo's Naturally! Natural Foods Grocer in Carlsbad, California. After her initial purchases of the Hu product, Ms. Mirreghabie visited the Hu website in order to further investigate the product. Based on her review of the website, and the various promises and affirmation made therein, she began ordering the Hu product for regularly monthly delivery.

55.     When purchasing the Products, Ms. Mirreghabie was seeking chocolate bars she believed to be premium, or of a higher quality, than other confectionaries. Moreover, Ms. Mirreghabie would have avoided any food she knew contained unsafe levels of toxic

heavy metals like lead and cadmium. She would also have avoided purchasing any food she knew could increase her risk of inhibited neurological function, anemia, kidney damage, seizures, coma, or death.

56.     Mr. Jennen occasionally purchased the Green & Black's 70% Organic Cacao dark chocolate Mondelēz product during the Class Period. He regularly shops for products like the Green & Black's at Whole Foods and Sprouts in San Diego and Riverside counties. As best he can recall, he purchased the Green & Black's product from Whole Foods in San Diego, California, and/or from Sprouts locations in Chula Vista and Hemet, California.

57.     When purchasing the Products, Mr. Jennen was seeking chocolate bars he believed to be premium, or of a higher quality, than other confectionaries. Mr. Jennen specifically understood that the product's call out of its high "cacao" content meant that it would provide antioxidant benefits, rather than the detrimental reactive radicals resulting from consumption of heavy metals. Moreover, Mr. Jennen would have avoided any food he knew contained unsafe levels of toxic heavy metals like lead and cadmium. He would also have avoided purchasing any food he knew could increase his risk of inhibited neurological function, anemia, kidney damage, seizures, coma, or death.

58.     Plaintiffs acted reasonably in purchasing the Products, whose labels did not disclose the presence, or risk of presence, of unsafe levels of lead or cadmium, and in fact conveyed to reasonable consumers that the Products did not contain substantial levels of toxic ingredients, including lead or cadmium, or the attendant health risks in consuming the Products.

59.     By omitting that its Products contained, or were at risk for containing, unsafe levels of lead or cadmium, Mondelēz was able to gain a greater share of the snack market, specifically the confectionary and dark chocolate market, than it would have otherwise and to increase the size of the market.

15

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

60. Plaintiffs paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent Mondelēz's omissions regarding the lead and cadmium content described herein.

61. Plaintiffs would not have purchased the Products if they had known that they were misbranded pursuant to California and FDA regulations, or that they contained unsafe levels of toxic lead or cadmium in the amounts found in the Products.

62. For these reasons, the Products were worth less than what Plaintiffs and the Class Members paid for them.

63. Plaintiffs and the Class lost money as a result of Mondelēz's omissions and unfair practices in that they did not receive what they paid for when purchasing the Products.

64. Plaintiffs still wish to purchase dark chocolate products, and continue to see Mondelēz dark chocolate products at the stores they regularly shop. They would purchase the Mondelēz Products in the future if, because of an injunction requiring Mondelēz to disclose lead or cadmium when present they could be assured, by the absence of a disclosure, that the Products no longer contained unsafe levels of toxic metals, including lead or cadmium. But unless Mondelēz is enjoined in the manner Plaintiffs request, they may not be able to reasonably determine whether the lead or cadmium in the Products has been addressed, or whether Mondelēz is continuing to omit their presence. Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Mondelēz, continues to be violated every time Plaintiffs are exposed to the Products' labels.

65. Mondelēz's unfair business practices that result in higher concentrations of toxic heavy metals, including lead and cadmium, being present in the Products than are present in the cacao beans from which they are made should also be enjoined. Absent such an injunction, Plaintiffs cannot be assured that Mondelēz has stopped this unfair business practice which unnecessarily concentrates amounts of heavy metals in the Products.

66. Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

67.     While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons in the United States, or alternatively in California, who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, the Mondelēz Products (the "Class").

68.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

69.     Questions of law and fact common to Plaintiffs and the Class include:

a.      whether Defendant communicated a message through its packaging and advertising that conveyed to reasonable consumers that the Products did not contain toxic chemicals, including lead and/or cadmium;

b.      whether that message was material, or likely to be material, to a reasonable consumer;

c.      whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

d.      whether the omissions on the Products' labels with respect to lead content is material, or likely to be material, to a reasonable consumer;

e.      whether the omissions on the Products' labels with respect to cadmium content is material, or likely to be material, to a reasonable consumer;

f.      whether the omissions regarding lead content was reasonably likely to deceive a reasonable consumer;

g.      whether the omissions regarding cadmium content was reasonably likely to deceive a reasonable consumer;

h.      whether Mondelēz's conduct violates public policy;

17

i.      whether Mondelēz's conduct violates state or federal food statutes or regulations;

j.      whether Mondelēz made and breached warranties;

k.      the proper amount of damages, including punitive damages;

l.      the proper amount of restitution;

m.      the proper scope of injunctive relief; and

n.      the proper amount of attorneys' fees.

70.     These common questions of law and fact predominate over questions that affect only individual Class Members.

71.     Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Mondelēz's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same unfair, misleading and unlawful conduct when they purchased the Products and suffered economic injury because of Mondelez's business practices. Absent Mondelēz's business practice of unfairly, deceptively, and unlawfully labeling the Products by omitting material information regarding their toxic lead and cadmium content, Plaintiffs and Class Members would not have purchased the Products or would have paid less for them.

72.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving foods and beverages.

73.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

74.     Mondelēz has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

75.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violations of the Unfair Competition Law

#### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

76.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

77.      The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

78.     Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

79.     The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

#### Fraudulent

80.     A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

81.     As set forth herein, Mondelēz's claims and omissions relating to the Products are likely to deceive reasonable consumers and the public.

#### Unlawful

82.     As set forth herein, Mondelēz omissions are "unlawful" under the UCL in that they violate at least the following laws:

•      The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

•      The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

•      The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

•      The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety

Code §§ 110100 *et seq.*

83. By violating these laws, Defendant has engaged in unlawful business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code § 17200.

**<u>Unfair</u>**

84. Mondelēz's conduct with respect to the labeling, advertising, and sale of the Products was unfair because Mondelēz's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

85. Mondelēz's conduct including during post-harvesting, processing, storing, and ultimate sale of the Products to consumers was unfair because it unnecessarily introduced additional amounts of lead and cadmium into the bars. Specifically, a significant amount of the lead and cadmium found in the Products sold at retail is introduced into the beans after they were picked and removed from pods, and then again, more heavy metals are introduced into the final retail Products. Mondelēz's unfair business practices ultimately led to unsafe levels of toxic heavy metals being present in the Products.

86. Mondelēz's conduct with respect to the labeling, advertising, and sale of the Products was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

87. Mondelēz's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Mondelēz through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products unaware that they contain toxic lead or cadmium and are of the

type that can increase the risk of poor health. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research into the lead and/or cadmium content of the Products, which could only feasibly be revealed by laboratory testing, which is not a reasonable expectation. Further, the harm could have easily been avoided by Mondelēz as it would have cost them only minimally to indicate to consumers that the Products contain unsafe toxic heavy metals, or that these toxins can over time accumulate in the body to the point where poisoning, injury, and/or disease can occur.

88.    Mondelēz profited from the sale of the falsely, deceptively, and unlawfully advertised the Mondelēz Products to unwary consumers.

89.    Plaintiffs and Class Members are likely to continue to be damaged by Mondelēz's deceptive trade practices, because Mondelēz continues to disseminate misleading information. Thus, injunctive relief enjoining Mondelēz's deceptive practices is proper.

90.    Mondelēz's conduct caused and continues to cause substantial injury to Plaintiffs and other Class Members. Plaintiffs have suffered injury in fact as a result of Mondelēz unlawful conduct.

91.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Mondelēz from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

92.    Plaintiffs and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

93.    Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Mondelēz's challenged behavior.

### SECOND CAUSE OF ACTION

### Violations of the False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500 *et seq.*

94.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

95.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

96.     It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

97.     As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the dark chocolate Products was likely to mislead consumers acting reasonably, as to the healthfulness of the products.

98.     Plaintiffs suffered injury in fact as a result of Defendant's actions as set forth herein because Plaintiffs purchased the Products in reliance on Defendant's false and misleading marketing claims stating or suggesting that Products do not contain toxic heavy metals, including lead and/or cadmium.

99.     Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from the Products' labeling.

100.     Defendant profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

101.   As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

102.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

103.   Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims), and restitution is not limited to returning to Plaintiffs and Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act

### Cal. Civ. Code §§ 1750 *et seq.*

104.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

105.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

106.   Mondelēz's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Mondelēz Products for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

a.  § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.  § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.  § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.  § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

107.  Mondelēz profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

108.  Mondelēz's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

109.  Pursuant to California Civil Code § 1782, more than 30 days before filing this amended complaint, Plaintiff Rodriguez sent written notice of her claims and of Mondelēz's particular violations of the Act to Mondelēz by certified mail, return receipt requested, but Mondelēz has failed to implement remedial measures.

110.  Plaintiffs and the Class have suffered harm and seek (a) actual damages resulting from purchases of the Mondelēz Products sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising and a corrective advertising plan, (d) restitution, and (e) attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

111.  In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue was filed with the original complaint. *See* Dkt. No. 1-2.

## FOURTH CAUSE OF ACTION

## Breach of Express Warranties, Cal. Com. Code § 2313(1)

112.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

113.   Through the Products' labeling, Defendant made affirmations of fact or promises, or description of goods, that, inter alia, the products are free of harmful toxins, including lead and cadmium. These promises include those identified, *supra*, in Section II, ¶¶ 28-31.

114.   These representations were "part of the basis of the bargain," in that Plaintiffs and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

115.   Defendant breached its express warranties by selling the Products that are not free from, but rather contain, harmful levels of toxic chemicals, including lead and cadmium, which are likely to increase the risk of chronic diseases.

116.   That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and Class Members paid for the Products.

117.   As a result, Plaintiffs seek, on behalf of themselves and other Class Members, their actual damages arising as a result of Defendant's breaches of express warranty, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314

118.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

119.   As set forth herein, Mondelēz manufactured and sold the Products, and prior to the time the Products were purchased by Plaintiffs and other Class Members, impliedly warranted that the Products were of merchantable quality and fit for their ordinary use, i.e., consumption by consumers, including children.

120.   Mondelēz is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there were, in the sale to Plaintiffs and the Class, implied warranties that those goods were merchantable.

121.   Mondelēz impliedly warranted to retail buyers that the Products were merchantable in that they (a) would pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. Defendant breached this implied warranty because the Products were unsafe in that they contained toxic lead and cadmium. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used, which is consumption by consumers, including children.

122.   Moreover, Mondelēz, through its acts set forth herein, in the sale, marketing, and promotion of the Products, made representations to Plaintiff and the Class Members that, among other things, the Products do not contain toxic heavy metals, including lead or cadmium. However, the Products do contain unsafe levels of toxic heavy metals, including lead and cadmium, as set forth in detail herein. Thus, Mondelēz breached that implied warranty.

123.   Mondelēz was on notice of this breach as it was aware of the lead and cadmium in the Products, including based on receiving notice in at least 2014.

124.   As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods. Further, Plaintiffs and the Class Members have been injured and harmed because they would not have purchased the Products or would have paid less for it if they knew the truth about the Products, namely, that they contained lead and cadmium.

125.   As a result, Plaintiffs seek actual damages, including, without limitation, expectation damages.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**

126.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

127. Mondelēz's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiffs' and Class Members' purchases of the Products, and the economic benefits conferred on Mondelēz are a direct and proximate result of its unlawful and inequitable conduct.

128. It would be inequitable, unconscionable, and unjust for Mondelēz to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

129. As a result, Plaintiffs and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Mondelēz as a result of such business practices.

## **PRAYER FOR RELIEF**

130. Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Mondelēz as to each and every cause of action, and the following remedies:

a. An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b. An Order requiring Mondelēz to bear the cost of Class Notice;

c. An Order compelling Mondelēz to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending Products;

d. An Order compelling Mondelēz to cease its unfair business practices which unnecessarily result in concentrating high levels of heavy metals in the Products;

e. An Order requiring Mondelēz to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
FIRST AMENDED CLASS ACTION COMPLAINT

f.      An Order requiring Mondelēz to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.      An Order requiring Mondelēz to pay compensatory damages and punitive damages as permitted by law;

h.      An award of attorneys' fees and costs; and

i.      Any other and further relief that Court deems necessary, just, or proper.

## JURY DEMAND

131.   Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 17, 2023                    /s/ Trevor Flynn

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***

*Rodriguez et al. v. Mondelēz Global LLC*, 23-cv-57-DMS-AHG
First Amended Class Action Complaint